## Helphenstine v. Commonwealth.

(Decided March 9, 1923.)

### Appeal from Fleming Circuit Court.

Homicide—Dying Declaration Defendant Shot Without Cause is Incompetent.—In a dying declaration the statement that defendant shot declarant without any cause was incompetent as a conclusion.

O. R. BRIGHT for appellant.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, and B. S. GRANNIS, Commonwealth Attorney, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON—Reversing.

Appellant Helphenstine was convicted in the Fleming circuit court of the crime of voluntary manslaughter in the killing of Clarence Gardner, and his punishment fixed at confinement in the state penitentiary for a term of eight (8) years. He appeals.

Clarence Gardner and appellant Helphenstine were neighbors in a farming district in Fleming county; ap-

pellant owned a small store which he kept in a smoke house at the rear of his dwelling; Gardner and another were operating a sawmill in the neighborhood and were buying more or less goods from appellant Helphenstine. Some of the employes at the mill ran accounts at the store. Russell Gardner was the ten-year old son of Clarence Gardner, deceased. He was frequently sent to the store for groceries and other supplies. In doing this he obtained tobacco and chewing gum on the credit of one Moore without the knowledge of Moore. When Moore came to settle his account he discovered these items and upon inquiry was informed by appellant Helphenstine that the boy had been getting the articles and having them charged to Moore's account. Moore paid the bill, which amounted to only thirty-five cents, and carrying a note from the appellant to the father of Russell Gardner, informed him of his son's misconduct. When Moore gave the note to Clarence Gardner he called his son and inquired of him about the account and then with Moore and his son went immediately to appellant's store. The books were examined and the items verified. Being convinced that his son had done wrong, the deceased, Clarence Gardner, paid the bill to Moore, and taking his son Russell by the hand said in substance, "Come, go take your licking," and led him out back of the store, where he cut a switch and gave the boy a brushing. The boy cried and screamed while his father was punishing him. Appellant was then in the store, but when he heard the boy crying he and Moore came out on the steps on the front of the store, and appellant remarked to Moore that the deceased, Clarence Gardner, must be reported for whipping his boy, but this was not heard by Gardner. Flogging being over the parties all started towards the house, Moore following the path around the house towards the front gate, while appellant went in at his kitchen door and procured a shotgun and stood in the door. The deceased, who had to pass that way, soon came along traveling the path until he reached the gate at the rear of the house; there the path diverged, one prong leading towards the kitchen door where appellant Helphenstine stood and the other around the house in the direction which Moore had traveled. About the time Clarence Gardner came into the yard a gunshot was heard and Moore glancing backward saw him fall near the fence in the back yard. He could not see appellant nor did he know who fired the shot. A moment

later he saw appellant with a gun and heard him say in substance that he had killed a man. Moore picked Gardner up and carried him to his home. It is the contention of appellant Helphenstine that he hallooed at the deceased while he was whipping his boy; that this angered deceased, who picked up some rocks and started back in the direction of appellant, whereupon appellant became frightened and ran into his kitchen and got his gun and stood in the door; that when deceased came through the back gate he had some rocks in his hands and started along the path leading to the kitchen door at which appellant was standing, threatening to do violence to appellant. Thereupon appellant spoke to deceased and asked him not to come into his house, which request was ignored, and appellant fired the shot which took the life of Gardner when the latter was about eight (8) feet from the kitchen door, traveling in the direction of appellant, threatening to do appellant injury. The little son of Gardner did not see the shot fired but he was very near the point where the homicide occurred at the time he heard the report of the gun. Both he and Moore, who was just around the corner of the house, say that the deceased fell near the fence and along the path which leads from the back gate around the house towards the front gate and that deceased was traveling along that path at the time the fatal shot was fired instead of along the path towards the kitchen door, as contended by appellant. No one seems to have heard any words between appellant and deceased, if any were spoken. Gardner lingered a day or so after his wound and died. Before his death, however, he made a dying declaration which was allowed to go to the jury as evidence, of which complaint is now made by appellant. He also insists that the trial court erred in instruction No. 4, given to the jury.

The dying declaration of which complaint is made reads as follows:

"William Helphenstine on April 25, 1922, while I was at his house I was whipping my boy over some tobacco he had got at Helphenstine's store and had it charged to another fellow; Helphenstine got mad because I whipped my boy and went into the house and got a shotgun and came to the door and shot me without any cause. I didn't know he had anything against me."

Very little of this declaration amounts to competent evidence at all. Next to the last sentence contains a very damaging statement. That sentence reads: "Helphen-

stine got mad because I whipped my boy and went into the house and got a shotgun and came to the door and shot me without any cause." All of this sentence is largely if not entirely an expression of opinion. He could not and did not know the mental attitude of appellant. No words had passed between them nor had they been together. Certainly the concluding clause, "he shot me without any cause," was both erroneous and prejudicial. This was a mere conclusion of the deceased. We have frequently held that statements like the foregoing, "he shot me without any cause," were, when contained in a dying declaration, incompetent. We have also held that the expressions, "I have been shot down for nothing," and "I have been shot for nothing," and "Let him come and tell we what he shot me for," were not statements of fact but mere conclusions, and therefore all incompetent and prejudicial to the substantial rights of appellant. Philpot v. Commonwealth, 195 Ky. 555. Likewise have we held, "He did not know what made Star shoot him," incompetent in the case of Star v. Comth., 97 Ky. 197. "Mitchell Collins killed me and killed me for nothing," was held incompetent in the case of Collins v. Comth., 12 Bush 272. Many other instances might be cited of similar expressions contained in dying declarations which were rejected because incompetent and so prejudicial as to require a reversal of the judgment.

The trial court should not under the circumstances have allowed that part of the statement reading, "he shot me without any cause," to have gone to the jury. It was prejudicial error. Instruction No. 4 stated the law of self-defense in a reasonably clear and concise way, but on another trial we suggest that the court change that part of the instruction reading, "the said Helphenstine in the exercise of a reasonable judgment, no other safe means of avoiding the then impending, or to him reasonably apparent danger to him, then he had the right to shoot and kill deceased," so as to conform to the usual and approved instructions on self-defense in cases like this.

For the reasons indicated the judgment is reversed for a new trial.

Judgment reversed.